[Cite as *In re M.T.*, 2013-Ohio-4269.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | | |

IN RE: M.T.

C.A. Nos.  13CA0024
13CA0025

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.  11-1612-AND

DECISION AND JOURNAL ENTRY

Dated: September 30, 2013

MOORE, Judge.

{¶1}   Appellants, Melissa H. ("Mother") and Thomas H. ("Stepfather") separately appeal from a judgment of the Wayne County Court of Common Pleas, Juvenile Division, that denied Stepfather's motion for legal custody; terminated Mother's parental rights to her child, M.T.; and placed M.T. in the permanent custody of Wayne County Children Services ("CSB"). This Court affirms.

I.

{¶2}   Mother and Shawn T. are the biological parents of M.T., born July 20, 2001. Shawn T. believed permanent custody was in M.T.'s best interest and voluntarily surrendered his parental rights at the beginning of the permanent custody hearing.  He is not a party to this appeal.  When the present case began, Mother was married to Stepfather. Their household included not only M.T., but also J.G., the minor child of Stepfather. Mother and Stepfather obtained a divorce in the midst of the trial court proceedings, but continued to live together.

Although Thomas H. did not technically remain as M.T.'s Stepfather after his divorce from Mother, we refer to him in that manner for the sake of clarity.

{¶3} The household had been under an order of protective supervision since 2009 through a previous juvenile case. That case was based on multiple incidents of domestic violence between Mother and Stepfather. According to reports, the fighting appeared to be mutual, with Mother and Stepfather each involved in calling the police. In some instances, M.T. had to call the police. Many of these occasions included Mother threatening suicide.

{¶4} On May 18, 2011, events giving rise to the present case began. The children were removed from the home because Mother attempted to commit suicide by ingesting prescription pills while Stepfather recorded the scene and the children watched in fright. The court case was begun on August 1, 2011 with a re-filed complaint, at which time the agency alleged dependency and sought temporary custody of M.T. J.G.'s custodial status was litigated separately. *See In re J.G.*, 9th Dist. Wayne No. 12CA0037, 2013-Ohio-417.

{¶5} On September 23, 2011, the juvenile court adjudicated M.T. to be a dependent child pursuant to a stipulation by the parties and placed her in the temporary custody of the agency. The trial court adopted a reunification case plan, requiring Mother and Stepfather to address substance abuse, mental health, and parenting skills. Much later, homemaker services were added. Supervised visitation was offered to Mother and Stepfather. M.T. and J.G. were placed together and visits were often held together.

{¶6} On November 28, 2012, CSB moved for the permanent custody of M.T. Stepfather moved for legal custody, an effort supported by Mother in preference to permanent custody. Following a hearing, the trial court denied Stepfather's motion for legal custody,

granted permanent custody of the child to CSB, and terminated the parental rights of Mother and Shawn T. Mother and Stepfather separately appeal and each assigns two errors for review.

II.

## MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE WAYNE COUNTY CHILDREN SERVICES BOARD (CSB) AS CSB FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT IT IS IN THE BEST INTEREST OF THE MINOR CHILD TO GRANT PERMANENT CUSTODY.

## MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY FINDING GROUNDS FOR PERMANENT CUSTODY AS SUCH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶7} Through her two assignments of error, Mother contends the trial court erred in granting permanent custody of M.T. to CSB because neither of the two prongs of the permanent custody test was supported by clear and convincing evidence. The arguments will be addressed together.

{¶8} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996). Clear and convincing evidence is that which will "produce in the mind

of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶9} As to the first prong of the permanent custody test, the trial court made two findings. The court first found that M.T. had been in temporary custody for more than 12 months of a consecutive 22-month period, pursuant to R.C. 2151.414(B)(1)(d), and also found that the child could not be returned to either parent within a reasonable time or should not be returned to a parent, pursuant to R.C. 2151.414(B)(1)(a). Only one finding is necessary to satisfy this portion of the permanent custody test. *See* R.C. 2151.414(B)(1).

{¶10} In considering how long M.T. had been in the temporary custody of the agency under R.C. 2151.414(B)(1)(d), the statute proscribes that a child enters temporary custody "on the earlier of the date the child is adjudicated * * * or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1)(d). In this case, we rely on the fact that M.T. was adjudicated dependent on September 23, 2011. Additionally, the child must have been in temporary custody of the agency for at least 12 months of a consecutive 22-month period before the motion for permanent custody is filed in order to satisfy this section. *In re C.W.,* 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 26. The motion for permanent custody was filed on November 28, 2012. Having been in temporary custody from September 23, 2011 through November 28, 2012, M.T.'s situation meets the requirements of R.C. 2151.414(B)(1)(d).

{¶11} On appeal, Mother has not disputed the trial court finding on this point, but rather focuses on the alternative first-prong finding. Because we find clear and convincing evidence that the child was in the temporary custody of the agency for more than 12 months of a consecutive 22-month period, it is not necessary for this Court to consider the alternative finding

that the child cannot be placed with a parent within a reasonable time or should not be placed with a parent. *See* R.C. 2151.414(B)(1). Accordingly, Mother's second assignment of error is overruled.

{¶12} After the first prong of the permanent custody test is found to be satisfied, the trial court must determine whether a grant of permanent custody is in the child's best interest. In so doing, the juvenile court must consider all relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the children, the wishes of the child, the custodial history of the child, and the child's need for permanence in his life. *See In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3, (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶13} The record reveals that Mother and Stepfather were the only individuals with significant interactions and interrelationships with M.T. There is negligible evidence regarding any positive interaction with other relatives. M.T. reported no interest in maintaining a future relationship with J.G., with whom she resided in foster care. M.T.'s biological father has been incarcerated for a sexual offense against a minor and a no contact order currently prevents him from having any contact with her. Accordingly, our inquiry focuses on the child's relationships with Mother and Stepfather.

{¶14} Mother, Stepfather, and M.T. each completed a psychological evaluation as part of the reunification case plan. Mother's evaluation revealed that she was diagnosed with severe depression, anxiety, posttraumatic stress disorder, and a dependent personality. She had suffered

physical abuse from an ex-husband and other men, had difficulty managing her emotions, and had poor self-esteem. The psychologist recommended mental health counseling as well as substance abuse counseling, and she indicated that Mother was not likely to improve without such treatment. Mother did not comply with the recommendations. She stopped attending counseling after only seven sessions and did not complete her goals.

{¶15} Regarding Stepfather, the psychologist diagnosed depression, substance abuse, and strong passive aggressive tendencies. She reported that he has many anti-social behaviors, is very self-centered, has difficulty meeting the needs of others, has admitted past abuse of drugs, and is at risk for physical abuse and neglect of children. The psychologist testified that Stepfather's diagnosis can make parenting difficult if he puts his own needs before the needs of the child. In addition, his mental capacity may make it difficult for him to learn new concepts. Stepfather explained that he had recorded Mother's suicide attempt in an effort to counter CSB's determination that he had been deemed inappropriate. He felt that his wife had a big problem with marijuana. He expressed concern that she would not be able to complete her part of the case plan, while he was determined to complete his part. The psychologist recommended that Stepfather follow-up with a drug and alcohol assessment, mental health counseling, and parenting classes. Stepfather did not comply with the recommendation. He completed parenting classes, but attended only an intake assessment at a counseling center, and failed to attend even one counseling session thereafter.

{¶16} As to M.T., the psychologist described her as an unhappy child at the time, experiencing high levels of depression and anxiety. She had some difficulty knowing right from wrong. A prominent theme was wishing Stepfather would treat her better and not be so mean. She also wished her family would be more responsible, and she hoped Mother would never try to

kill herself again. M.T. was said to have clinical difficulties with aggression. She had witnessed repeated violence between Mother and Stepfather. Stepfather's health problems frightened her. She often found herself in the position of having to call the police or an ambulance to the home and of protecting J.G. and even protecting the adults from one another. The psychologist recommended counseling to decrease traumatic symptoms and parentified behaviors. She also pointed to the need to work through the effects of witnessing abuse. She recommended that M.T. continue to reside in foster care until Mother and Stepfather improve physically and emotionally.

{¶17} M.T. complied with the recommendation and has been in counseling for one and one-half years. The counselor's treatment goals were to help her increase coping skills, whereas M.T.'s goal was that Mother stop saying she was going to kill herself. The counselor reported that M.T. had been fearful and scared in her home. She has made progress, which the counselor attributes to the consistency of being in the same foster home. The counselor believes M.T. is able to function better emotionally in the foster home where she reported feeling safe. M.T. reported that she liked her friends and felt that her current foster situation was good despite having lots of rules.

{¶18} The psychologist addressed the impact of the adults' behavior on M.T. She explained that the repeated domestic violence between Mother and Stepfather placed M.T. in a precarious parentified role that was emotionally unhealthy. It forced M.T. into taking on responsibility for their behaviors and forced her into actions that are more typical of an adult than a child her age.

{¶19} Mother completed a series of parenting classes and her supervised visits generally went well, but there were some concerns on the part of CSB. The caseworker reported that she

found it necessary to speak to Mother numerous times about interacting with her daughter and had to encourage her to be more engaged during visits. In addition, the case aide noted that Mother looked as though she was under the influence of something on a couple of occasions. Her eyes were barely open and she stared at the walls. When the children spoke, she would say "huh, what, huh?" She appeared tired and lackadaisical. Mother attended 81 of 122 visits.

{¶20} Stepfather also completed parenting classes, but two witnesses expressed concern with his interactions with M.T. A case aide testified about a summertime visit held at a local park at which Stepfather read the sports section of a newspaper for 20 minutes until the aide asked him to engage with the children. More recently, at a November 28, 2012 visit, the case aide reported that Stepfather twice put his hands up M.T.'s shirt, stopping when the case aide looked at him. There were additional reports that he kissed her on the lips and held her on his lap. The case aide indicated that Stepfather's increased interest in being physically affectionate with M.T. was recent. Stepfather denied touching M.T. inappropriately, but M.T. told the guardian ad litem that his touching made her feel uncomfortable. He attended 44 out of 122 visits.

{¶21} Mother completed a drug and alcohol assessment during the prior case, but did not complete a current assessment as was requested. She continued to use illegal substances and has not engaged in any treatment to address the issue.

{¶22} Stepfather did complete a drug and alcohol assessment, in which he reported that he smoked one to three marijuana joints a day, continued to use marijuana even after CSB involvement, and previously tried to stop smoking. These factors led the evaluator to make a provisional diagnosis that Stepfather was substance dependent, subject to further evaluation by a counselor. However, Stepfather never followed up with any counseling. Stepfather does not

believe his marijuana use is a problem and asserts that he does not smoke it around the children, though M.T. mentioned his use of marijuana to the caseworker. Stepfather claims that he uses marijuana to counter pain and depression.

{¶23} Mother and Stepfather both testified that there have not been any domestic violence incidents or suicide threats since the children were removed. They believe they can continue to reside together as friends and raise M.T. together, despite their divorce. Mother cites a change in her medication and becoming medication compliant as the reason for a more stable mental status. Stepfather has a rare blood disorder which, he claimed, caused him to have more than 100 hospitalizations for an average of 30 days each since 2004. He claims that his new medication will mean fewer hospitalizations in the future.

{¶24} Both adults argue that because a half-sibling of M.T. visits at their home occasionally when that child's father permits, that their home must be appropriate for M.T. The argument is not persuasive given the specific issues before this Court.

{¶25} The caseworker testified to a difficult relationship with Stepfather. She said that Stepfather left a voice mail message for her, threatening to "punch" any one that said anything to him at an upcoming family team meeting. She explained that she received another voice mail message from him saying she was not allowed at his home without a sheriff's deputy. Stepfather admitted that he told the caseworker she could not come to the house without a sheriff's deputy. He also admitted that he left her another voice mail message to "back the F off[.]" The caseworker had previously offered transportation to Stepfather and Mother, but terminated the offer to Stepfather after these threatening behaviors. Some "home" visits were thereafter held off-site.

{¶26} M.T.'s wishes as to custody were conveyed by the guardian ad litem. She testified that M.T. has a bond with Mother, but not with Stepfather. The guardian ad litem also stated that M.T. reported being "ok with adoption." She said M.T. did not want to go back to the home because she did not feel safe there. The guardian ad litem reported that although M.T. liked to visit with Stepfather, she expressly stated that she does not want to live with him. This is consistent with M.T.'s statements to her counselor who testified that M.T. worried about returning home and does not want to return because she felt unsafe there. The guardian finally reported that M.T. had very recently indicated that she would be okay living with Mother, even if her mental health and drug issues were untreated – because "she's my mom[.]" The guardian ad litem believes M.T. has been repeatedly placed at risk of harm by the adults in her life and recommended that the trial judge grant permanent custody.

{¶27} M.T.'s custodial history is not well detailed in the record, but it appears that she resided with Mother for the first years of her life. From the age of eight to ten, she resided with Mother and Stepfather, but under the protective supervision of CSB due to repeated episodes of domestic violence. At ten, she was removed from the home, and she resided in a kinship placement for five and one-half weeks. That placement disrupted because the behaviors of M.T., J.G., and the caregivers' adopted child were not working out. M.T. was then moved to a foster home where she has remained.

{¶28} The caseworker expressed concern with the couple's long history of domestic violence as well as the situation where Stepfather recorded Mother's attempted suicide while fearful children watched. She noted that neither adult had obtained any meaningful mental health treatment. The caseworker stated that she does not believe that M.T. can return to the home because it is not a safe environment for her. She also does not believe M.T. could reside

with Mother alone because Mother has not addressed her mental health or substance abuse issues. In addition, Mother has no income and no residence of her own. Mother testified that she has continued to live with Stepfather despite their divorce because she has nowhere else to go. Mother added that she is currently reapplying for social security disability benefits and also pointed out that she would be entitled to additional services if M.T. were living with her. CSB introduced evidence of one conviction for disorderly conduct in 2011 for Mother. Stepfather is unemployed and receives $600 in monthly disability payments. The record contains evidence that Stepfather has two convictions for domestic violence; one for possession of drug paraphernalia, one for possession of a controlled substance, marijuana; one for the unauthorized use of property; and one violation of community control since 2007. The couple used an open oven and a space heater as their only heat sources in their home over the winter. Stepfather reported that they had a furnace but no ductwork.

{¶29} There are no relatives available to provide care for M.T. The foster parents have said that they are uncertain about adopting any more children. The trial court reasonably concluded that the only way to achieve a legally secure permanent placement for M.T. is through an award of permanent custody.

{¶30} Upon review, this Court concludes that the record reveals clear and convincing evidence that it was in the best interest of M.T. to be placed in the permanent custody of the agency. Mother's first assignment of error is overruled.

**STEPFATHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED IN DENYING THE LEGAL CUSTODY REQUEST BY [STEPFATHER] AND GRANTING PERMANENT CUSTODY TO WCCSB BECAUSE THEY FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE DENIAL OF THE CHANGE OF CUSTODY TO [STEPFATHER] WAS IN THE CHILD'S BEST INTEREST.

{¶31} In his first assignment of error, Stepfather asserts that the trial court erred in denying his motion for legal custody. Stepfather declared that he is seeking legal custody because he wanted M.T. to be able to spend more time with Mother and her 14-year-old half-brother, who lived with his father.

{¶32} Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a non-parent is based solely on the best interest of the child. *See In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23, citing *In re Fulton*, 12th Dist. Butler No. CA2002-09-236, 2003-Ohio-5984, ¶ 11. As Stepfather states, this Court has relied upon the statutory best interest test in R.C. 2151.414(D) for guidance in evaluating legal custody decisions in the past and Stepfather urges such a review here. *See, e.g., In re R.R.,* 9th Dist. Summit No. 23641, 2007-Ohio-4808, ¶ 12. This Court previously engaged in a best interest analysis upon those same statutory factors as part of its permanent custody analysis above and concluded that the evidence clearly and convincingly established that permanent custody was in the best interest of child

{¶33} In deciding that permanent custody is clearly and convincingly in the best interest of the child, the trial court necessarily determined that it was not in her best interest to be placed in the legal custody of Stepfather. Our review of the evidence persuades us that the trial court did not err in denying Stepfather's motion for legal custody. Stepfather's first assignment of error is overruled.

**STEPFATHER'S ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN DENYING THE LEGAL CUSTODY REQUEST BY [STEPFATHER] BASED UPON THE FACT THAT [HE] USES MARIJUANA.

**{¶34}** In his second assignment of error, Stepfather asserts that the trial court erred in denying legal custody to him because he uses marijuana. Stepfather asserts error because there was no evidence that his marijuana use affected his parenting of M.T. In support of his position, he cites this Court's decision in *In re R.S.,* 9th Dist. Summit No. 21177, 2003-Ohio-1594.

**{¶35}** Stepfather's argument is without merit. *In re R.S.* may be distinguished from the present case both legally and factually. First, the legal analysis in *R.S.* is not at all relevant to the matter at issue in the present case. *R.S.* concerned an adjudication of dependency, which is an implicit determination of the parent's unsuitability, *In re C.R.,* 108 Ohio St.3d 369, 2006-Ohio-1191, paragraph two of the syllabus, whereas the question of whether Stepfather should have legal custody of M.T. focuses exclusively on the best interest of the child. *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23, citing *In re Fulton*, 12th Dist. Butler No. CA2002-09-236, 2003-Ohio-5984, ¶ 11. There has already been an adjudication of dependency in the present case. Only the question of the best interest of the child remains in regard to the question of the legal custody of M.T.

**{¶36}** Second, the cases are factually distinct. In finding dependency in *R.S.,* the trial court based its decision on finding that the mother's "long-term drug use * * * necessarily impacts the children's environment." *Id.* at ¶ 7. In reversing, this Court specified that the mother's "use of marijuana was relevant evidence," but also emphasized that "[t]he conduct of a parent is relevant * * * solely insofar as that parent's conduct forms a part of the environment of [these] child[ren]." *Id.* at ¶ 13, citing *In re Burrell*, 58 Ohio St.2d 37, 39 (1979). The record

revealed that the agency had "no evidence" that the mother ever had more than a minimal quantity of the drug in her home, "no evidence" as to the amount of marijuana consumed by the mother, and "no evidence" that the mother's use of marijuana affected her parenting. *Id.* at ¶ 14. No marijuana or marijuana paraphernalia was found in the home. *Id.* Significantly, there was "nothing to suggest" that the mother failed to meet any of her children's needs in any manner. *Id.* at ¶ 19. This Court concluded that, under the circumstances, it was "unreasonable to infer," as the trial court did, that her marijuana use might lead to incarceration and an inability to care for her children. *Id.* at ¶ 21. While not condoning a parent's use of an illegal substance, absent any evidence showing a detrimental impact from the mother's use of marijuana upon the children and absent any other evidence in support of dependency, this Court refused to conclude that the state was warranted in adjudicating the children dependent and removing them from the mother's custody. *Id*. at ¶ 13, ¶20.

**{¶37}** In the present case, there is no indication that the trial court decision denying Stepfather's motion for legal custody was based solely on his use of marijuana. Indeed, this case began after an extreme incident in which Mother threatened suicide while Stepfather recorded the event and the children frantically observed it all. The main concerns in this case involved significant mental health issues in both adults, a lengthy history of domestic violence that negatively impacted the emotional health of the children, and parenting issues – none of which were satisfactorily addressed by either of the adults in the case. Finally, the decision involves a nearly twelve-year-old girl who absolutely does not wish to be in Stepfather's care. The fact that Stepfather smoked marijuana was addressed by the case plan, but it was hardly the cornerstone of the case. These factors easily distinguish this case from *R.S.* Stepfather's second assignment of error is overruled.

III.

**{¶38}** Mother's two assignments of error are overruled. Stepfather's two assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

BELFANCE, J.
CONCURS.

CARR, J.
CONCURRING.

{¶39}  I agree with the opinion of the Court that M.T. should be placed in the permanent custody of CSB.  I write separately only to address the issue of a half-sibling of M.T. who also visits in the home.

{¶40}  Both adults argue that because a half-sibling of M.T. visits at their home, that their home must, therefore, be appropriate for M.T.  In response, CSB differentiates the half-sibling's situation from that of M.T. by claiming that the half-sibling is "substantially older" at 14 years of age, that he is "likely more capable to deal with the situations presented by the home," and that his visits on alternating weekends are "quite limited."  In my view, these arguments are not persuasive and, furthermore, they reflect a somewhat disconcerting posture for the agency to take.  Nevertheless, given the extremely limited evidence regarding the half-sibling's custodial situation and the circumstance of his visits, I cannot find the argument by Mother and Stepfather to be dispositive of the precise issues before this Court.

APPEARANCES:

NIKKI LEIGH REED, Attorney at Law, for Appellant.

CONRAD G. OLSON, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and NATHAN R. SHAKER, Assistant Prosecuting Attorney, for Appellee.