[Cite as *In re M.S.*, 2014-Ohio-2096.]

### IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### GREENE COUNTY

IN THE MATTER OF: M.S. & J.S.

Appellate Case No. 2013-CA-0069

Trial Court Case No.   B44251

(Appeal from Juvenile Court)

. . . . . . . . . . .

## O P I N I O N

Rendered on the 16th day of May, 2014.

. . . . . . . . . . .

BRITTANY M. HENSLEY, Atty. Reg. No. 0086269, Greene County Children Services Board, 61 Greene Street, Xenia, Ohio 45385
        Attorney for Appellee

ALAN COLLINS, Atty. Reg. No. 0062915, 2002 North Fountain Boulevard, Springfield, Ohio 45504
        Attorney for Appellee-Minor Children

TARA C. DANCING, Atty. Reg. No. 0077277, 1158 Kaufman Avenue, Fairborn, Ohio 45324
        Attorney for Appellant-S.S.

J.P.S., Dayton, Ohio
        Appellee-Pro Se

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    In this case, Appellant, S.S., appeals from a juvenile court decision awarding

legal custody of her minor children, M.S. and J.S., to their biological father, J.P.S.[1]  S.S. contends that the trial court erred in granting legal custody of the minor children to their father.

{¶ 2}    We conclude that the trial court did not err in awarding legal custody of the minor children to J.P.S.  The evidence indicates that the children's best interests were served by granting legal custody to the biological father.  Accordingly, the judgment of the trial court will be affirmed.

I.   Facts and Course of Proceedings

{¶ 3}    On August 16, 2012, the Juvenile Division of the Greene County Common Pleas Court granted an ex parte order of emergency custody of M.S. and J.S. to the Greene County Children Services Board ("CSB"), based on a report from CSB that the children were in immediate danger from their surroundings and that removal was necessary in order to prevent immediate or threatened physical or emotional harm.

{¶ 4}    The following day, CSB filed a complaint, stating that the children appeared to be abused and dependent.  CSB had received a physical abuse report on March 19, 2012, which alleged that the biological mother, S.S.,  had been having mood swings, and had beat M.S. with a stick, causing the stick to break.  M.S. had purplish-red marks and bruises to her back and shoulders.  S.S. had admitted to a caseworker that she hit M.S. with a stick, causing bruises down her shoulders and back.  CSB concluded that the mother's behavior was concerning because she was unable to control her emotions and physically acted out on M.S.  As a result, CSB completed a safety plan for the children to stay with their biological father, J.P.S., and had

---

[1]    In order to protect the children's privacy, we will use initials for their names and the names of their parents.

also called the police. Charges of Domestic Violence and Child Endangering were forwarded to the prosecutor. A temporary protection order was put in place between S.S. and M.S., and during court proceedings, S.S. agreed to participate in a two-year program through Fairborn Municipal Court.

{¶ 5} The complaint also alleged that J.S. had shown many improvements since being with his father, and had told his teacher that he was afraid his mother would hurt him. M.S. also reported to a teacher that she was "safe" now. According to the complaint, S.S. had not complied with the municipal judge's orders, was non-compliant with supervised visits with J.S., and had indicated to J.S. and others that she planned on taking the children. As a result, CSB had elected to file a complaint in juvenile court, seeking emergency custody.

{¶ 6} On August 17, 2012, CSB also filed a motion for a predispositional interim order, supported by an affidavit containing the same facts as had been alleged in the complaint.

{¶ 7} The trial court granted CSB's motion for predispositional interim custody on August 22, 2012. The court ordered that J.P.S. would be given interim custody, with protective supervision to CSB. The court made other orders, including that S.S. sign all release forms, complete full psychological and parenting evaluations and follow all recommendations, and continue to participate in mental health counseling and therapy programs. The court further ordered that S.S. and M.S. must participate in family counseling prior to unsupervised contact. Finally, the court ordered that supervised visitation would take place between the mother and the children at the Visitation Center once per week, for two hours at a time. On the same date, the court appointed a Court Appointed Special Advocate/Guardian Ad Litem ("CASA/GAL") for the children. The court also appointed attorneys for the children and for the mother.

**{¶ 8}** In September 2012, CSB filed a case plan. The goal was to reunify the children and the mother, with the same basic prerequisites that the court had outlined, including that S.S. work on parenting skills with her counselor and demonstrate appropriate parenting skills. S.S. was also required to comply with visitation through the Visitation Center, and follow through with recommendations. In addition, the case plan required mental health examinations for the children, and follow-through with the mental health recommendations.

**{¶ 9}** In October and November 2012, the CASA/GAL submitted reports. Initially, there were issues with cleanliness and the number of animals in the father's home. The CASA/GAL recommended that the children stay in his home, but noted that there needed to be strict supervision due to these issues.

**{¶ 10}** On November 27, 2012, a magistrate issued a decision finding that M.S. was abused and dependent, and that J.S. was dependent. Disposition was continued until November 28, 2012, due to the need for additional testimony. The magistrate then issued a decision in December 2012, relating facts about abuse and the social worker's concern that S.S. might kill the children if they were returned to her. Although S.S. had complied with the municipal court program and the case plan, S.S. resisted seeing mood instability as a problem, and the parenting aspects of counseling had not been addressed. The magistrate also noted that while J.P.S. had initially been overwhelmed when the children were placed in his care, he had restored his home to a safe, clean environment and had reduced the number of animals. The children were happy and adjusted in his home and their new school. Accordingly, the magistrate awarded legal custody to J.P.S., with protective supervision to CSB, and continued visitation for S.S. at the Visitation Center.

**{¶ 11}** S.S. filed objections to the magistrate's decision. In January 2013, CSB filed an amended case plan, removing S.S. from the plan because J.P.S. had been granted legal custody. Subsequently, in February 2013, CSB filed a semi-annual administrative review, indicating that significant progress had been made by J.P.S. on the issues that had been of concern to CSB. CSB stated that it planned to close the case after the court ruled on the objections, because the father had custody and there were no active safety concerns.

**{¶ 12}** In April 2013, the trial court filed an order stating that the magistrate's findings of fact were supported by the evidence. However, the court concluded that the dispositional order should be changed to temporary custody to J.P.S., rather than legal custody. The court's order was based on the fact that both parents previously had issues jeopardizing the children. In view of the court's order, CSB filed an amended case plan in April 2013, adding S.S. to the case plan, and providing services for her. The goals and requirements were the same as had been previously outlined, i.e, reunification.

**{¶ 13}** CSB then filed a motion in July 2013, asking the court to modify its disposition of temporary custody. In the motion, CSB expressed concern about S.S.'s mental health. CSB alleged that S.S. was unable to control her anger when upset, and that J.P.S. had continued to demonstrate that he could meet the children's needs while maintaining a safe environment. Accordingly, CSB asked the court to award legal custody to J.P.S. An amended case plan was also filed, changing the goal from reunification to permanent placement with a relative.

**{¶ 14}** The court again appointed an attorney for S.S. In October 2013, the CASA/GAL filed an updated report, stating that the children's school attendance and tardiness had improved dramatically from the previous year, and that the children seemed well-adjusted in

school. The CASA/GAL also indicated that the mother did come prepared for each visitation and demonstrated affection to the children. However, there were numerous visitation violations, most of which were violations by S.S. These included: late arrivals; no-shows; negative talk about the father in front of the children; unwillingness to visit with the children due to the children having lice; inability to maintain corrective actions from the Visitation Center staff; and other behavioral incidents.

{¶ 15} The CASA/GAL expressed some concern about J.P.S.'s unwillingness to accept services from Youth Management, but also stated that she could not recommend placement with the mother. While S.S. did a good job with the children short-term, she had not proven herself capable of long-term visitation, much less custody. In addition, both children had stated that they did not want to live with their mother and that they wished to have limited and supervised visitation with her. The CASA/GAL, therefore, recommended that J.P.S. be given legal custody.

{¶ 16} The hearing on the modification request, plus custody requests that S.S. had filed, were set for hearing on October 10, 2013. On the day before the hearing, S.S. filed a motion asking the court to dismiss her attorney, based on a conflict of interest due to "philosophical differences." At the hearing, the court confirmed that S.S. did not want to be represented by an attorney, and relieved her counsel from further duties. S.S. then represented herself at the hearing.

{¶ 17} During the hearing, CSB presented testimony from Kathleen Diegelman, the Director of Youth Services at the Family Solutions Center, April Whalen, the therapist for the children at the Family Solutions Center, and Nicole Larson, a supervisor for CSB. S.S. presented testimony from J.P.S. and Chris Pinkelman, the Director of Mental Health and

Emergency Services for an organization referred to as TCN.

{¶ 18}  Pinkelman had been providing services for S.S. in connection with the program she had been ordered to complete for the Fairborn Municipal Court.  He indicated that she had met the core requirements for the program and was better equipped to handle stressful situations than when she had entered the program.  However, his personal involvement with her in the program had ended four months previously, and he had never had a chance to observe her with her children.

{¶ 19}  Family Solutions was the therapy center for M.S. and J.S.  Whalen had been M.S.'s therapist since September 2012.  J.S. had been transferred to Whalen from another therapist, and her first appointment with J.S. was in March 2013.  Whalen had seen M.S. fourteen times before the hearing, and had seen J.S. about ten times.

{¶ 20}  Whalen indicated that M.S. (who was nine years old at the time of the hearing), suffered from post-traumatic stress disorder.  M.S. had shown good progress, and had been decreasing her flashbacks, which were of being punched in the stomach, being hit on the back, going to school with bruises, being hit on the jaw, and being taken to the hospital, with the hospital being informed that a brick had fallen on her.  However, beginning in April 2013, and after learning of the change from legal to temporary custody, M.S. had reported more flashbacks.  She was fearful of being returned to her mother and of being abused again if she went home.  Conversely, M.S. stated that she was happy that she was with her father and liked it there.

{¶ 21}  Based on M.S.'s flashbacks and anxiety, Whalen concluded that family counseling with M.S. and her mother would not be appropriate because M.S. was not yet stable enough.  M.S. had also indicated that she did not want family counseling.

{¶ 22}    J.S. (who was five years old at the time of the final hearing), had been diagnosed with attention deficit hyperactivity disorder and oppositional defiance disorder.   Whalen worked with J.S. on anger management skills and on being still and focused.   J.S. also expressed fear of being removed from his father's home, and had said that he wanted to live with his father.

{¶ 23}    On April 22, 2013, S.S. came in to Family Solutions to meet with Whalen.   The reason for the meeting was that S.S. wanted to start family counseling.   However, Whalen did not feel it was in M.S.'s best interest at that time, due to the increased flashbacks and the need for M.S. to become stable.   Whalen had consulted with her supervisor, Kathleen Diegelman about this, and Diegelman agreed.

{¶ 24}    S.S. began asking Whalen about her qualifications and became angry, loud, and belligerent.   Whalen tried to calm her down, and S.S. asked to see Whalen's supervisor.   When they went into Diegelman's office, S.S. was still very angry, and told Whalen that she was just in it for the money and that her children were nothing more than science experiments to Whalen. Diegelman told S.S. that she could not speak to employees that way, and excused Whalen from the meeting.

{¶ 25}    Diegelman described S.S. as loud, angry, verbally attacking the therapist, and argumentative.   Diegelman tried to come up with a resolution, but S.S. continued to be loud and belligerent, and even reached onto Diegelman's desk.   Eventually, Diegelman asked S.S. to leave.   Diegelman then called the CSB caseworker and told her that until she (Diegelman) decided otherwise, S.S. was not to come back to Family Solutions.

{¶ 26}    Nicole Larson, the outgoing supervisor for CSB, indicated that the children had been in J.P.S.'s custody since March 2012, and were doing well.   The children and their father

had a bond, and the children appeared to be very comfortable with him. If they had a problem or were injured, they went to him for soothing, and they spoke with him openly. They looked to J.P.S. for parenting when they needed it. All the children's needs were being met in J.P.S.'s home. Larson indicated while a few concerns had been expressed about the condition of the home at the previous year's adjudication hearing, they had all been addressed, and there had been no concerns within the last six months.

{¶ 27} According to Larson, M.S. had expressed a lot of anxiety recently about the court hearing. M.S. said she was worried about being placed back in her mother's home. The agency was also concerned about the multiple violations S.S. had during visitation. During 25 visits, S.S. had 36 infractions. All of them involved S.S. making negative comments about the children's father or the caseworker, S.S. trying to tell the children to pass messages to their father, or S.S. making negative comments about what was going on. If a worker at the Visitation Center tried to correct her, she became belligerent and angry and that was another infraction.

{¶ 28} S.S. also had not signed releases, as required, and had not been able to engage in family counseling. Furthermore, CSB had not recently been able to work with S.S. A case worker was not able to see S.S. in April 2013. The caseworker was able to catch up with S.S. at the end of May, but had not been able to have a home visit in June, July, August, or September 2013.

{¶ 29} On July 26, 2013, the caseworker attempted a home visit, and S.S. told the caseworker that she would not be working with CSB anymore because she felt unsupported. S.S. then shut the door. The caseworker made two more attempts in July. On July 31, 2013, S.S. became very upset and agitated, began screaming and yelling, and told the caseworker to get

off her property. S.S. also came towards the caseworker, who felt threatened. As a result of that confrontation, CSB put precautions in place for the caseworker's safety. The caseworker was told to hold monthly meetings at the agency rather than going to S.S.'s home. From that time forward, the caseworker sent letters to S.S., inviting her to the agency, and providing alternate times to choose from. However, S.S. did not respond to any of the letters.

{¶ 30} Larson testified that CSB did not feel that S.S. was capable of parenting the children for any extended period of time due to her mental health concerns, the visitation reports, the episodes CSB had witnessed, the interaction that CASA/GAL had with S.S., and the reports of the children. CSB recommended that it was in the best interest of the children for J.P.S. to have legal custody, with CSB retaining protective supervision.

{¶ 31} S.S. did not testify. She called J.P.S. as a witness, but he did not add anything helpful to her case. During the hearing, the trial court also interviewed the children separately, in camera.

{¶ 32} After hearing the evidence, the trial court filed a decision awarding legal custody to J.P.S. and protective supervision to CSB. In addition, the court ordered that visitation for S.S. would continue at the Visitation Center. S.S. appeals from the judgment of the trial court awarding legal custody to J.P.S.

### II. Did the Trial Court Err in Granting Legal Custody to the Father?

{¶ 33} S.S.'s sole assignment of error is as follows:

The Court Erred in Granting Legal Custody of M.S. and J.S. to the Father.

{¶ 34} Under this assignment of error, S.S. contends that the decision granting custody

to J.P.S. was against the manifest weight of the evidence. In this regard, S.S. argues that she had made progress in her own therapy in learning how to handle stressful situations, and that she wanted to participate in family counseling. S.S. additionally notes that the children's wishes are not dispositive, and that J.P.S. admitted that he was taking pain medication, that he has a "bad memory," and that he had recently cancelled the mother's parenting time.

{¶ 35}   In *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, the Supreme Court of Ohio concluded that the manifest weight standards outlined in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), should apply to civil cases. *Id.* at ¶ 17. Thus, "[w]hen a [judgment] is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *Thompkins* at 387. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the [judgment].' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 36}   In *Eastley*, the Supreme Court of Ohio also stressed that:

In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable

presumption must be made in favor of the judgment and the finding of facts.   * * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, which in turn quotes 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

**{¶ 37}** Where a child has been designated abused, neglected, or dependent, R.C. 2151.353(A)(3) allows the juvenile court to "[a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings."

**{¶ 38}** "A juvenile court has broad discretion in the disposition of an abused, neglected, or dependent child.   See R.C. 2151.353(A) and Juv.R. 29(D).   The dispositional options include, among other things, granting a children-services agency temporary custody, committing the child to the permanent custody of a children-services agency, or awarding legal custody to a relative or any other person. R.C. 2151.353(A). 'In choosing among the alternatives, the best interest of the child is the court's primary consideration.' " *In re S.A.*, 2012-Ohio-3394, 974 N.E.2d 1261, ¶ 41 (2d Dist.), quoting *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 13.

**{¶ 39}** "An award of legal custody of a child does not divest parents of their residual

parental rights, privileges, and responsibilities." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus. As a result, courts apply a preponderance of the evidence standard to the factual findings of the trial court. *See, e.g.*, *In re W.A.J.*, 8th Dist. Cuyahoga No. 99813, 2014-Ohio-604, ¶ 2; and *In re J.W.*, 2d Dist. Greene No. 2009 CA 8, 2009-Ohio-4605, ¶ 14.

{¶ 40} " 'Preponderance of the evidence simply means "evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it." ' " *In re J.W.* at ¶ 14, quoting *In re A.W.*, Montgomery No. 21309, 2006-Ohio-2103, ¶ 6. (Other citation omitted.) "An appellate court may overrule a trial court's determination regarding child custody only upon finding an abuse of discretion." *Id.*, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159 (1997).

{¶ 41} We find no abuse of discretion, nor do we find that the trial court's decision was against the manifest weight of the evidence. To the contrary, the court's decision is well-supported by the evidence, which indicates that the children's best interests were served by granting legal custody to the biological father.

{¶ 42} "R.C. 3109.04(F)(1) requires the trial court to consider all relevant factors in determining the best interest of a child. These factors include, but are not limited to: the wishes of the parents; the child's interactions and interrelationships with parents, siblings, and other persons who may significantly affect the child's best interest; the child's adjustment to home, school and community; and the mental and physical health of all persons involved in the situation." *In re J.W.* at ¶ 15.

{¶ 43} Consideration of these factors indicates that the best interests of the children

weigh in favor of custody to the father. The children were well-adjusted to their father's home and their school, and their relationship with their mother was poor. Both children told therapists and others that they were happy in their father's home and did not wish to live with their mother. Most significantly, the mother's mental health posed a continued risk to the children. Although S.S. had made strides in the court-ordered mental health counseling, there were numerous episodes where she could not control her anger and belligerence, and showed a lack of judgment in dealing with others and with the welfare of her children. Parents who are concerned with the welfare of their children do not attempt to use them as pawns against the other parent. *See, e.g., Bell v. Bell*, 2d Dist. Clark No. 97-CA-105, 1998 WL 288945, *1 (June 5, 1998).

{¶ 44} As a final matter, we note that the allegations against J.P.S. are inaccurate. Contrary to S.S.'s contention, J.P.S. testified that his doctor had informed CSB that his pain medication was at a low level and had little effect. J.P.S. also testified that, as S.S. was aware, he had always had a bad memory. And finally, J.P.S. had cancelled one visitation because he had a new job and was required to work the day of the visitation. The record does not indicate that J.P.S. normally did anything other than facilitate visitation and encourage the children to see their mother.

{¶ 45} Accordingly, S.S.'s sole assignment of error is without merit and is overruled.

## III. Conclusion

{¶ 46} S.S.'s sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, P.J., and FAIN, J.,    concur.

Copies mailed to:

Brittany M. Hensley
Alan Collins
Tara C. Dancing
J.P.S.
Hon. Robert W. Hutcheson