[Cite as *In re D.M.*, 2015-Ohio-141.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | | |

IN RE: D.M.

C.A. No.     14CA010587

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     12 JC 37211

DECISION AND JOURNAL ENTRY

Dated: January 20, 2015

MOORE, Judge.

{¶1} Appellant, Brooke M. ("Mother"), appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that granted legal custody of her child, D.M., to the child's grandmother. This Court affirms.

I.

{¶2} Mother and Quado G. ("Father") are the unmarried parents of D.M., born January 6, 2006. Father is not a party to this appeal.

{¶3} On August 4, 2012, police were dispatched to Mother's home in response to a report that a man with a gun was holding a woman against her will. When the police arrived, they found Mother, Father, and another woman at the home. D.M. was not present; he was with Doreen P., the child's maternal grandmother ("Grandmother"). According to unchallenged findings made by the magistrate at the adjudication, Mother had a black eye and other bruises, and the bathroom door of the home was damaged. The other woman testified that Father had a

gun, beat Mother, and threatened both of them. Father was arrested and was later charged with having a weapon under a disability, drug paraphernalia offenses, and possession of drugs. Mother declined to complete an affidavit for the police.

{¶4} Eight months earlier, Mother and Father had been involved in another incident for which Father was convicted of domestic violence and Mother was convicted of obstruction of official business for lying to police about Father's whereabouts. Father was also reported to have two convictions for drug-trafficking.

{¶5} On September 19, 2012, Lorain County Children Services ("LCCS") filed a dependency and neglect complaint in juvenile court, seeking custody of D.M. The complaint cited ongoing violence between the parents, the parents' denial of any violence, and the fact that neither parent is employed or has any verifiable means to meet the child's basic needs. Thereafter, D.M. was adjudicated dependent and neglected, and he was placed in the temporary custody of Grandmother with protective supervision in LCCS.

{¶6} The case plan focused on the child's need for a safe and stable home. Both parents were to provide the caseworker with names of relatives as possible caregivers, attend the child's appointments, and support the child's caregiver. Additionally, Mother was to keep a neat and clean home in good repair, with working utilities and no safety hazards. She was to complete drug abuse, mental health, and domestic violence assessments and follow all recommendations. She was also to notify the caseworker of "any and all contact" with her "abuser." When the case began, Mother's visits took place at Grandmother's home and were supervised by her. Later, Mother had unsupervised visits and overnight visits at her own home. For his part, Father was additionally to address drug abuse, mental health, and domestic violence, and to resolve his criminal charges without incurring any additional ones. The trial court ordered

Father to have no contact with D.M. until he began cooperating with LCCS and working on his case plan. He never did so, and, therefore, he was not permitted to have any contact with his son throughout the remainder of the case.

{¶7} LCCS initially supported reunification of D.M. with Mother, but eventually sought an award of legal custody to Grandmother, believing that Mother had not fully addressed the safety concerns stemming from the domestic violence incident that initially brought the child into its care. A hearing was held before a magistrate upon competing motions for legal custody to Mother and Grandmother. At the conclusion of the hearing, the magistrate issued a decision granting legal custody to Grandmother. Mother's objections to that decision were overruled by the trial judge, and the trial judge then ordered that legal custody of D.M. be granted to Grandmother. Mother appeals and assigns one error for review.

II.

## ASSIGNMENT OF ERROR

> THE TRIAL COURT'S GRANT OF LEGAL CUSTODY TO MATERNAL GRANDMOTHER CONSTITUTED AN ABUSE OF DISCRETION AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶8} Mother has challenged the award of legal custody to Grandmother and the denial of her motion for custody, claiming that the trial court abused its discretion and that the judgment was against the weight of the evidence.

{¶9} Generally, this Court reviews a trial court's action with respect to a magistrate's decision for an abuse of discretion. *See, e.g., Fields v. Cloyd*, 9th Dist. Summit No. 24150, 2008-Ohio-5232, ¶ 9. However, "[i]n so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 18.

**{¶10}** When a child has been adjudicated neglected and dependent, the trial court has several dispositional alternatives available, including legal custody to either parent or to any other person who has filed a motion requesting legal custody of the child prior to the dispositional hearing. *See* R.C. 2151.353(A). The decision to grant or deny a motion for legal custody is within the juvenile court's sound discretion. *In re M.S.,* 9th Dist. Summit No. 22158, 2005-Ohio-10, ¶ 11. This Court will not reverse that decision absent an abuse of discretion. *Id.* An abuse of discretion implies that a trial court was unreasonable, arbitrary, or unconscionable in its judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶11}** The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts have concluded that the trial court must base such a decision on the best interest of the child. *See, e.g., In re N.P.,* 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. We have previously indicated that the best interest factors of R.C. 2151.414(D) may provide some guidance in determining whether legal custody is in the best interest of the child. *In re B.C.*, 9th Dist. Summit Nos. 26976, 26977, 2014-Ohio-2748, ¶ 16, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Consequently, on review, this Court will consider the factors set forth in R.C. 2151.414(D) in evaluating the best interest decision of the trial court. Those factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his life. *Id.*

**{¶12}** Before addressing the evidence presented on these factors, we note that Mother has argued that the trial court failed to consider that, as a parent, she had a "paramount" right to custody of her child over Grandmother. That right is not absolute, however. *See In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 40. The Ohio Supreme Court has, in fact, recognized, that

"parents who are suitable persons have a 'paramount' right to the custody of their minor children." (Citations omitted.) *In re Murray*, 52 Ohio St.3d 155, 157 (1990). Nevertheless, the Court has also indicated that an adjudication of abuse, neglect, or dependency "implicitly involves a determination of the unsuitability of the child's * * * parents." *In re C.R.,* 108 Ohio St.3d 369, 2006-Ohio-1191, paragraph two of the syllabus. Accordingly, "[o]nce the case reaches the disposition phase, the best interest of the child controls." *In re D.A.,* 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 11. There has already been an adjudication of neglect and dependency in the present case. Only the question of the best interest of the child remains in regard to the legal custody of D.M. *See In re M.T*., 9th Dist. Wayne Nos. 13CA0024, 13CA0025, 2013-Ohio-4269, ¶ 35. *See also In re J.F*., 11th Dist. Trumbull No. 2010-T-0029, 2011-Ohio-3295, ¶ 39. Mother's argument on this point is, therefore, without merit. We proceed to consider the evidence presented on the best interest of the child.

{¶13} The record indicates that D.M. and Mother certainly love each other, and they got along fine during visits at Grandmother's home. However, when LCCS attempted to transition visits to Mother's home, D.M. was reluctant to go with her, apparently fearing that Father would be there. Mother denied that D.M. was uncomfortable at her home, but admitted that D.M. was "hesitant" to go with her. Mother blamed Grandmother for that. Grandmother indicated her belief that D.M. was, in fact, afraid to be at Mother's home, but denied that she has played any part in creating that fear. By way of example, Mother claimed that Grandmother interfered by frequently texting and calling D.M. during Mother's visitation time. For her part, Grandmother insisted that D.M. initiated the calls and that she would often hear Mother in the background of the calls, yelling at D.M. and frightening him.

{¶14} Mother's position regarding Grandmother was somewhat conflicted, but she generally acknowledged that Grandmother provided good care for D.M. For instance, while Mother felt that Grandmother was unnecessarily critical of her life choices and parenting skill, Mother also stated that she was pleased D.M. had been placed with Grandmother because she knew she loved him and would take good care of him. And similarly, while Mother admitted telling Grandmother that "when I get [D.M.], you're never going to see him again[,]" she also stated that if she regained custody, her daycare plan would be to use Grandmother because, despite their arguments, that is where D.M. is comfortable.

{¶15} By all accounts, Mother and Grandmother shared a contentious relationship that began long before this case. It included verbal arguments and name-calling. Their animosity spilled over to their testimony at the hearing, with allegations by each and corresponding denials by the other. While this Court considers witness credibility, we recognize that the trial court was in the best position to view the witnesses and assess their credibility, particularly in such areas. *In re Brown*, 9th Dist. Summit No. 21004, 2002-Ohio-3405, ¶ 9. *See also Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997).

{¶16} Following adjudication and disposition, D.M. began seeing a therapist in February 2013. The therapist testified that he tried to diminish the child's issues of fear, anxiety, and distress. He explained that D.M. had difficulty separating from Grandmother and experienced anxiety in attending unsupervised visits at Mother's home. The therapist testified that D.M. was worried and nervous about Father being at Mother's home.

{¶17} In August 2013, the therapist attempted to further address D.M.'s issues by instituting joint counseling for Mother and Grandmother preliminary to Mother engaging in counseling with D.M. The therapist wanted to try to find some common ground and reduce the

tensions between Mother and Grandmother that led to D.M.'s distress. He believed that if he could get Mother and Grandmother together, it would send a powerful message to D.M. and hopefully reduce some of his anxieties. He said that Grandmother was willing, but Mother refused to participate in joint counseling. Although it was not the therapist's preference, he agreed to allow Mother to do individual counseling with him instead because he felt it was important to begin some work along these lines. Mother began counseling in September 2013 and had three sessions with the therapist before the hearing. Mother believed she benefitted from the counseling. At the time of the hearing, she had not yet done any joint counseling with D.M.

{¶18} A friend of Mother testified on her behalf that she believed Mother was very capable, protective, and a very good mother to her son. Her own son was a good friend of D.M., and the two boys often played together before this case and, more recently, during D.M.'s visits at Mother's home. The witness testified that she felt comfortable leaving her son in the care of Mother. She stated that she believed Mother had moved on from her relationship with Father.

{¶19} There was no evidence of a continuing positive relationship between D.M. and any other relatives. Mother testified that she had considered moving to Missouri to live with her own father if she got custody, but there was no evidence of an existing relationship between him and D.M. Grandmother testified that she had divorced this man because of his abuse of her. Grandmother also testified that he had expressed racist views about the bi-racial child, was unsupportive of Mother keeping the child, and had pondered ways to undermine Mother's financial position so that she would be unable to support D.M. and would have to relinquish him to the authorities.

{¶20} The wishes of D.M. were conveyed by the guardian ad litem. He explained that D.M. loves Mother, but wants to stay with Grandmother. According to the guardian, D.M. is

comfortable with Grandmother, and he likes his present school. D.M.'s therapist testified to the same effect, reporting that D.M. wanted to stay with Grandmother and that he felt safe there. At the request of LCCS, an in camera interview of D.M. was conducted by the magistrate with the guardian ad litem in attendance. The record does not contain a transcript of that interview, but there is no indication that the child's testimony differed from the guardian's representations of his wishes regarding placement.

{¶21} The guardian ad litem further testified that Mother had made great efforts during the case and loves her son, but he also expressed concern for the safety of D.M. if the child were returned to Mother due to the continuing presence of Father in Mother's life. He believed Father could be a danger to the child, particularly noting Father's use of a firearm in the incident that initiated this case. The guardian also stated that Father has not supported his son.

{¶22} At the same time, the guardian ad litem observed that D.M. was thriving in the care of Grandmother. His school attendance was very good, and he has been receiving excellent grades. His teachers described him as a leader in his classroom. The guardian ad litem believed that it would be in the best interest of D.M. to be placed in the legal custody of Grandmother.

{¶23} Regarding the child's custodial history, D.M. and Mother resided with Grandmother for the first three years of the child's life. Thereafter, D.M. resided with Mother, while Grandmother cared for him on weekends, school holidays, and summers for the next three years. While Mother testified that she had been in a relationship with Father for nine years and that, prior to this case, she considered herself Father's "wife," it is unclear whether and when Mother, Father and D.M. lived together as a family. When this case began, D.M. was placed with Grandmother, and he remained there for the remainder of the case.

{¶24} Regarding visitation, Mother was initially scheduled to have several supervised visits per week at Grandmother's home. Later, Mother was offered unsupervised and overnight visits at her own home. Grandmother claimed Mother's attendance at visits was inconsistent, while Mother claimed she only missed visits when her work or other case-planning services conflicted. Father was barred from any contact with D.M. during the case because of his continuing failure to cooperate with LCCS and his failure to address any part of his case plan.

{¶25} The remaining question before the trial court was whether Mother or Grandmother could provide a legally secure permanent placement for D.M. Safety is a consideration included within this factor.

{¶26} The record indicates not only that Grandmother believed D.M. was afraid to go to Mother's home, but also that D.M's therapist, as set forth above, and the caseworker had similar opinions. The caseworker testified that D.M. told her he was scared and nervous about going to Mother's home because he believed Father was there and something could happen to him. On the other hand, Mother did not credit this fear and denied that D.M. was afraid of Father.

{¶27} In this regard, the caseworker noted with concern that Mother continued to have contact with Father during the case. For example, Mother chose to attend Father's birthday party in June 2013, received Father at her home in September 2013,[1] and had frequent telephone conversations with him.

{¶28} Mother not only admitted to having these contacts with Father, but also indicated that she would continue to do so because he is "my son's father." Mother argued that the case

---

[1] This meeting took place shortly after Father's probation officer testified that Father told him he and Mother were going to reside together when the case was over. Despite claiming to be upset about Father's statement, Mother nevertheless explained that she allowed him into her home because he wanted to know about the case. Mother felt she should update Father, even though he had failed to comply with his case plan or attend the court proceedings himself.

plan prohibited Father from having any contact with D.M., but that it did not bar her from seeing or speaking to Father. While it is true that the case plan did not explicitly bar Mother from having contact with Father, the case plan did address the domestic violence and safety issues in other ways that fail to support Mother's behavior. For instance, the case plan required Mother to report "any and all contact" with her "abuser" to the caseworker. Mother conceded that she failed to report her attendance at Father's birthday party to the caseworker as required. When the caseworker did become aware of Mother's contact with Father, she advised Mother to make D.M. her priority and to stay away from Father.

{¶29} Although the caseworker's advice was not technically a part of Mother's case plan, the same advice was communicated to Mother through a court-ordered channel. Mother's case plan included a domestic violence component. During two domestic violence assessments, Mother denied that there was any violence in her relationship with Father, and there was, therefore, no recommendation for follow-up counseling. LCCS and the trial court did not believe that Mother's denial was truthful and insisted that Mother attend a domestic violence program. Mother did attend the program and reported that she learned a great deal from it. Mother testified that, in that class, she was advised to "slowly but surely distance [herself]" from her abuser.

{¶30} There is additional evidence in the record that further supports a concern that Mother lacks understanding and insight into the safety risks to both her and her son. For instance, after Father victimized Mother in December 2011, Mother lied to the police about his whereabouts, resulting in a criminal conviction against her for the obstruction of justice. Then, in the August 2012 incident that resulted in the removal of D.M., Mother refused to complete a domestic violence affidavit against Father, despite evidence that he threatened her with a gun and

gave her bruises and a black eye. Next, Mother continued to defend Father to the caseworker and in court, and she declared him to be a good father, even though he failed to pay child support or participate at all in his case plan. Mother testified that "when it came to my son or his other kids,[2] he was a very concerned father. He protected [D.M.] * * * He might not have paid child support, but he gave me cars [for six or seven years], he's helped me pay bills[.] * * * [T]here is some things that a father can give to a child that a mother can't and he did those things."

{¶31} At the legal custody hearing, Mother finally admitted that she had been in a relationship with Father that involved domestic violence. She also admitted that she had been physically abused by Father in the past,[3] although not many times. Significantly, however, she denied that she had been "beaten" in the August 2012 incident. She admitted only that there was yelling and pushing in that incident, and specifically denied that she had received a black eye or bruises that day. She claimed that a contemporaneous picture of her revealed only that "[m]y makeup was smeared." In an unchallenged finding, the magistrate found otherwise. The caseworker also believed there was more to the incident than pushing and smeared makeup. She believed Mother's very belated admission of "domestic violence" in August 2012 was not sincere, but rather only reflected an effort to get her son back.

{¶32} The caseworker did not believe Mother could keep D.M. safe and concluded that it would be in the child's best interest to be placed in Grandmother's legal custody. She believes Grandmother has been taking good care of the child, could continue to meet his basic needs, and could provide the permanence and safety that he requires.

---

[2] Father was said to have twelve other children with 5 or 6 different women.
[3] Grandmother testified that she had observed her daughter with injuries, including black eyes, bruises and a fractured jaw, on many occasions over the past four years. She also claimed to have seen bruises on the child.

**{¶33}** The record suggests that Mother loves her child and has made good progress in many ways. Nevertheless, we cannot say that the trial court abused its discretion in this case given that it could have reasonably concluded that, despite a year of agency involvement, Mother has failed to put key principles of the reunification plan into practice; failed to appreciate the severity of her abusive relationship with Father and the negative impact it has had upon her child; and failed to demonstrate an understanding of her domestic violence counseling or to fully address the related issues. The record reveals that Mother has demonstrated a lack of insight and judgment in terms of her ability to keep herself and her child safe and secure. *See In re M.S.*, 2d Dist. Greene No. 2013-CA-0069, 2014-Ohio-2096, ¶ 43. This is perhaps even more concerning in light of the fact that Father has done nothing on his case plan to address his violent history.

**{¶34}** Based on our review of the record, we do not believe that the trial court abused its discretion in granting legal custody to Grandmother. Mother's assignment of error is overruled.

III.

**{¶35}** Mother's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

BELFANCE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

KATHLEEN M. AMERKHANIAN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and GREG PELTZ, Assistant Prosecuting Attorney, for Appellee.

JOEL FRITZ, Attorney at Law, for Appellee.

FRANK SOBOL, Guardian ad Litem.