[Cite as *In re J.G.*, 2014-Ohio-2570.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | | |

IN RE: J.G.

C.A. No.     14CA0004

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.     11-0991-AND

DECISION AND JOURNAL ENTRY

Dated: June 16, 2014

GALLAGHER, Judge.

{¶1} Appellant, Thomas H., appeals from a judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor child, J.G., and placed him in the permanent custody of Wayne County Children Services ("CSB"). This Court affirms.

I.

{¶2} J.G., born August 2, 2000, is the child of unmarried parents, Thomas H. ("Father") and Evelyn G. ("Mother"). Father later married Melissa H. ("Stepmother") and was married to her at the time this case began. Mother and Stepmother participated in the proceedings below, but only Father has appealed the trial court's judgment.

{¶3} While J.G.'s early custodial history is not well detailed in the record, it appears that J.G. resided with his paternal grandmother for a period of time until her death in 2010. After her death, J.G. was placed in the legal custody of Stepmother, apparently because Father suffers

from a blood disorder that required repeated hospitalizations. Stepmother resided with J.G., Father, and her daughter, M.T., born July 20, 2001, who is the child of a different man. In December 2010, CSB began working with the family on a voluntary basis to address the issue of domestic violence.

{¶4} A dependency case was filed in juvenile court on May 18, 2011, after several days of quarreling between Father and Stepmother during which Stepmother threatened to commit suicide and sheriff's deputies were repeatedly dispatched to the home. During one of these incidents, Stepmother actually attempted suicide by ingesting prescription pills and Father recorded the event with his cell phone while the two children watched. He later claimed he did so in an attempt to convince authorities that Stepmother needed psychiatric help. Stepmother was taken to the hospital where she received medical attention, but was released and returned home the same day. The following day, she was admitted to a hospital psychiatric ward. With the filing of this case, both children were removed from the home and placed in emergency temporary custody of CSB.

{¶5} The custody cases involving the two children proceeded separately. Stepmother's parental rights to M.T. were eventually terminated. *See In re M.T.,* 9th Dist. Wayne Nos. 13CA0024, 13CA0025, 2013-Ohio-4269.[1] In due course, J.G. was adjudicated dependent, and he was placed in the temporary custody of the agency.[2] The trial court adopted a case plan which required Father and Stepmother to address mental health, domestic violence, substance

---

[1] Stepmother and Father (as M.T.'s then stepfather) each unsuccessfully sought custody of M.T., while M.T.'s biological father voluntarily surrendered his parental rights. Ultimately, M.T. was placed in the permanent custody of CSB.

[2] Father appealed from the order adjudicating J.G. dependent and placing him in the temporary custody of CSB. This Court remanded the matter to require the trial court to support its reasonable efforts determination, but otherwise sustained the finding of dependency. *See In re J.G.*, 9th Dist. Wayne No. 12CA0037, 2013-Ohio-417.

abuse, and parenting skills. They were offered one or two supervised visits with J.G. a week. Mother was also provided with a case plan, which addressed mental health, substance abuse, and parenting skills. Father and Stepmother were divorced in the midst of the proceedings, but they continued to live together. We continue to refer to her as Stepmother for the sake of clarity.

{¶6} On March 29, 2013, CSB moved for permanent custody of J.G. Father moved for legal custody of his son, and Mother decided to voluntarily surrender her parental rights to the child. Following a hearing on the dispositional motions, the trial court denied Father's motion for legal custody, terminated Father's parental rights, and granted CSB's motion for permanent custody, finding that the child had been in temporary custody for more than 12 of 22 consecutive months and that permanent custody was in the best interest of the child. *See* R.C. 2151.414(B)(1). Father now appeals and assigns three errors for review.

II.

**Assignment of Error I**

> IT WAS ERROR, AS A MATTER OF LAW, AND PLAIN ERROR, TO GRANT THE AGENCY'S MOTION FOR PERMANENT CUSTODY BECAUSE THE AGENCY FAILED TO INCLUDE IN ITS CASE PLAN A SPECIFIC PLAN OF THEIR ACTIONS TO SEEK AN ADOPTIVE FAMILY FOR THE CHILD AND TO PREPARE THE CHILD FOR ADOPTION, AS REQUIRED BY R.C. 2151.413(E).

{¶7} Father asserts that the trial court erred in granting CSB's motion for permanent custody because the agency had not yet updated the child's case plan with a specific plan for adoption. R.C. 2151.413(E) provides: "Any agency that files a motion for permanent custody under this section shall include in the case plan of the child who is the subject of the motion, a specific plan of the agency's actions to seek an adoptive family for the child and to prepare the child for adoption." According to Father, this statute requires that a children services agency file a specific plan for adoption at the time it files a motion for permanent custody, and that the trial

court erred in granting the motion for permanent custody absent the inclusion of such a plan. Father asks that the matter be considered by this Court as plain error in light of the lack of a specific and timely objection to CSB's purported lack of compliance with the statute.

{¶8} Assuming, without deciding that this matter rises to the level of plain error, the merit issue has previously been settled against Father's claim by the Ohio Supreme Court decision in *In re T.R.,* 120 Ohio St.3d 136, 2008-Ohio-5219. In that case, the court acknowledged that R.C. 2151.413(E) requires a children services agency that files a motion for permanent custody to include an adoption plan in the child's case plan, but explained that the statute does not include a "temporal requirement" to state "*when* such an adoption plan must be added to the existing case plan." (Emphasis sic.) *In re T.R.* at ¶ 9 and ¶ 10. The court specifically concluded that "R.C. 2151.413(E) does not require a children-services agency that files a motion for permanent custody to update the child's case plan with an adoption plan before the juvenile court grants the motion." *Id.* at ¶ 12. *See also In re N.H.*, 9th Dist. Summit No. 24355, 2008-Ohio-6617, ¶ 8. Accordingly, the trial court did not err in granting permanent custody to CSB prior to the agency filing an adoption plan. Father's first assignment of error is overruled.

## Assignment of Error II

THE DECISION TO GRANT PERMANENT CUSTODY WAS NOT IN THE BEST INTERESTS OF J.G.

{¶9} In his second assignment of error, Father contends the weight of the evidence fails to support the trial court finding that permanent custody was in the best interest of the child. *See* R.C. 2151.414(D)(1).

{¶10} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both

prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶11} Clear and convincing evidence is that which will "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶12} In reviewing a challenge to the weight of the evidence, this Court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice. *See In re M.C.,* 9th Dist. Summit No. 24797, 2009-Ohio-5544, ¶ 8 and ¶ 17. *See also Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶13} The trial court found that J.G. had been in the temporary custody of CSB for at least 12 of 22 consecutive months in satisfaction of the first prong of the permanent custody test. *See* R.C. 2151.414(B)(1)(d). Father does not contest that finding, but rather challenges only the finding that permanent custody was in the best interest of the child.

{¶14} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the

custodial history of the child, and the child's need for permanence in his life. *See In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶15} J.G. has several special needs. He currently works with two counselors, a medical doctor, and a case manager. At the time of the removal from his home, he was ten and one-half years old and weighed less than 60 pounds. He was placed on a high-protein diet with supplements of Boost, but still weighed only 65 pounds two years later at the time of the permanent custody hearing. The guardian ad litem reported that J.G. has trouble with boundaries, is easily distracted, and is an easy target at school because of his small size and demeanor.

{¶16} Psychologist Marianne Bowden evaluated J.G. and diagnosed him with an adjustment disorder and attention deficit hyperactivity disorder. Dr. Bowden determined that J.G. was functioning at a borderline range of intelligence. She explained that the child witnessed extensive abuse between Father and Stepmother, and, as a result, was placed in a parental role to attempt to keep them from abusing each other. At the same time, J.G. said he loves Father and called him the best dad ever. Dr. Bowden recommended counseling for J.G., which he has been receiving while in foster care.

{¶17} Jennifer Zgonc has counseled J.G. on a bi-weekly basis since August 2011. At the permanent custody hearing, Ms. Zgonc explained that J.G. was not functioning very well at that time and his behavior had worsened over the last few months. She credits his behavioral

problems and anger outbursts to his unresolved custodial situation. J.G. knows that his current foster parents are not in a position to offer him a permanent home. Ms. Zgonc also noted that J.G.'s step sister is currently eligible to be adopted, which could be affecting J.G. The counselor stated that J.G. loves his Father, enjoys his visits with him, and generally feels sad and disappointed when Father misses scheduled visits. She believes J.G. will function better when he is in a more permanent environment.

{¶18} Dr. Bowden also conducted psychological evaluations of Father and Stepmother. She diagnosed Father with major depressive disorder, recurrent and severe; antisocial personality disorder with strong passive-aggressive tendencies; and substance abuse. Medically, he suffers from Thrombotic Thrombocytopenic Purpura ("TTP"), a blood disorder that has required him to have repeated hospitalizations for treatments in the past. Dr. Bowden stated that the Child Abuse Potential Inventory revealed that Father is at risk for physical abuse or neglect of children. She found that Father is very self-centered and has difficulty following through on tasks. His tendency to put his own needs before the needs of a child can make parenting difficult. She recommended that Father participate in mental health and substance abuse counseling, and she stated that changes in Father's diagnoses are unlikely without treatment.

{¶19} Dr. Bowden diagnosed Stepmother with major depressive disorder, recurrent and severe, as well as generalized anxiety disorder with dependent features. She, too, was at risk for physical abuse or neglect to children. Dr. Bowden recommended that she participate in counseling.

{¶20} Stacey Chuhi, the CSB caseworker assigned to the case from December 2011 through August 26, 2013, testified regarding Father's progress on his case plan objectives. She stated that Father had completed a set of parenting classes, but the agency still had concerns

about his ability to parent J.G. This was particularly so because he had not completed other case plan services that could directly impact his parenting skills. She explained that Father completed psychological and substance abuse assessments, but failed to complete the follow-up counseling that was recommended in both of those evaluations. Caseworker Chuhi also testified that Father missed at least 85 out of 142 scheduled visits with his son.

{¶21} Father completed two substance abuse assessments with two different agencies, the first in 2010 and the second in 2012. Both assessments determined that he was cannabis dependent and recommended that he engage in counseling. Father claims that he uses marijuana to counter pain and depression, but does not use marijuana around his child. On appeal, Father argues that he completed the program at the first agency. That is consistent with Father's self-report during the later assessment, but Father's counselor testified that Father attended only one counseling session in February 2010 and never returned. Again on appeal, Father asserts, based on his self-report during the second assessment, that another counselor "had taken him as far as she could," but Father testified that he attended only two counseling sessions with her. Records in evidence show that Father cancelled or "no-showed" four more sessions with that counselor. The record does not demonstrate that Father completed the recommended counseling. Father has not satisfied this component of his case plan.

{¶22} On cross-examination, Father did not dispute the caseworker's assessment of the number of visits that he attended because he said he did not keep track. He cited transportation problems as the reason for his poor attendance at visits and counseling sessions. He explained that he lost his driver's license and had to rely on friends to transport him to visits and appointments. Father testified that he will again rely on friends to transport J.G. to his

appointments should he regain custody, but believes it will be easier to get his friends to transport a child.

{¶23} Caseworker Chuhi testified that the agency offered transportation to Father early on, but due to Father's behavior, the agency was forced to terminate that offer for safety reasons. She explained, for example, that Father required her to bring a sheriff's deputy when she came for a home visit. She stated: "He told me I wasn't allowed at his home without a deputy." On another occasion, Father left a voice mail message for the caseworker, stating that he had some issues he wanted to deal with at an upcoming family team meeting, and if anybody said anything to him about it, "he would punch them in the face." Finally, during the investigation of a "sand-throwing" incident between M.T. and another child at a visit held at a park, Father told the supervising case aide to "back the f--- off." Based on these incidents, the agency declined to transport Father any longer. Ms. Chuhi gave Father the name of another community resource that might provide him with transportation.

{¶24} Caseworker Chuhi also testified regarding Father's conduct during visits. She said that some visits went well, but at other visits she had to encourage more interaction with J.G. She said there was little conversation between them and little demonstration of affection, such as hugs. Both Caseworker Chuhi and the later-appointed caseworker, Martha Jackson-Hill, testified that Father primarily wanted to play the same card game at visits while J.G. would rather do other things. Father's visits never progressed beyond supervised status. Based on what she had observed, Caseworker Chuhi did not believe Father could provide a stable environment for J.G.

{¶25} Caseworker Martha Jackson-Hill, who was assigned to the case for the last month before the permanent custody hearing, testified that she believed J.G.'s parents love him, but

they are unwilling or unable to do the things necessary to understand him and his needs. She explained that J.G. needs someone to be present for him and provide the things he needs in order to have a productive life. She believed that the fighting and arguing he witnessed took a toll on him.

{¶26} Father then testified in his own behalf. He explained that he was divorced from Stepmother, but that they still live together and get along better now than when they were married. He testified that he loves J.G. and believes he is able to care for his needs. Father has a limited support system. When asked who might provide child care for J.G., if needed, Father said he would rely on his grandmother; his ex-wife, who recently lost parental rights to her own child; and a friend named "Tim," whose last name he did not know.

{¶27} Stepmother also testified in Father's behalf and stated that she believed Father loved his son and could provide for him. She also conceded that neither she nor Father completed the recommended counseling.

{¶28} The record contains little evidence of any relationship between J.G. and Mother, and it contains negligible evidence of a positive relationship between the child and any other friends or relatives.

{¶29} The wishes of the child were conveyed by Renee Jackwood, the child's guardian ad litem, as she learned them during a recent personal interview of J.G. She reported that J.G.'s wishes are to not return to his home. Ms. Jackwood stated that J.G.'s position is consistent with her own recommendation for his well-being. The guardian ad litem believes that it would be in the best interest of J.G. to be placed in the permanent custody of CSB. Dr. Bowden similarly reported that J.G. told her that he did not wish to return home due to the ongoing violence that took place there. Although the trial court was mistaken in stating that the guardian ad litem did

not ask the child his opinion, the trial court did rely on the report of Dr. Bowden, which was to the same effect as the report of the guardian ad litem - that J.G. said he did not wish to return home.

{¶30} The third best interest factor requires consideration of the custodial history of the child. It appears that J.G. resided for a period of time with his paternal grandmother until her death in 2010. After her death, J.G. was placed in the legal custody of Stepmother. In December 2010, CSB became involved with the family on a voluntary basis. Six months later, J.G. was removed from the home and was placed in a foster home where he has remained. Father's attendance at visits has been sporadic. Mother has had little relationship with J.G., but has inquired of his status through the guardian ad litem and conveyed a hope to develop a relationship with him as an adult.

{¶31} As to the fourth best interest factor, there was evidence before the trial court that J.G. is in need of a legally secure placement. There were no suitable friends or relatives willing and able to provide for his care. There was evidence before the trial court that Father was not prepared to provide a safe and secure home for J.G. Father has untreated mental health problems, including domestic violence; untreated substance abuse issues; serious medical issues that require periodic hospitalization, and a negligible support system. He has two misdemeanor convictions for domestic violence against Stepmother. Father testified that he has been hospitalized for longer than a month more than 20 times, though he has not been hospitalized during the last year. He depends on friends for transportation and lives with his ex-wife with whom he has a history of domestic violence, a condition which neither of them has addressed through counseling.

{¶32} Upon consideration, we conclude that the evidence clearly and convincingly supports the trial court's determination that permanent custody is in the child's best interest. The record does not demonstrate that the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice. Father's second assignment of error is overruled.

### Assignment of Error III

THE COURT ERRED BY DENYING THE MOTION TO RETURN LEGAL CUSTODY TO [FATHER].

{¶33} In his final assignment of error, Father asserts that the trial court erred when it denied his motion for legal custody.

{¶34} R.C. 2151.353(A)(3) allows the court to award legal custody of a child who has been adjudicated abused, neglected, or dependent, to any person who, prior to the dispositional hearing, filed a motion requesting legal custody of the child. Assuming that an appropriate adjudication has taken place and that the applicant has complied with the statutory prerequisites, the decision of the trial court regarding the disposition is otherwise based upon the best interest of the child. *See In re M.S.*, 9th Dist. Summit No. 22158, 2005-Ohio-10, ¶ 9.

{¶35} Because R.C. 2151.353(A)(3) does not include factors for the determination of a child's best interest upon a request for legal custody, appellate courts reviewing legal custody decisions have obtained guidance from the statutory best interest factors used in permanent custody determinations, as set forth in R.C. 2151.414(D). *See, e.g., In re R.R.*, 9th Dist. Summit No. 23641, 2007-Ohio-4808, ¶ 12. *See also In re E.A.*, 8th Dist. Cuyahoga No. 99065, 2013-Ohio-1193, ¶ 13.

{¶36} In deciding that permanent custody is clearly and convincingly in the best interest of J.G., the trial court necessarily determined that it is not in his best interest to be placed in the

legal custody of Father. *See In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10. Having found no error by the trial court in deciding that permanent custody is in the best interest of the child, this Court similarly finds no error in the denial of Father's motion for legal custody. Father's third assignment of error is overruled.

## III.

**{¶37}** Father's three assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____

EILEEN T. GALLAGHER
FOR THE COURT


BELFANCE, P. J.
CARR, J.
CONCUR.

(Gallagher, J., of the Eighth District Court of Appeals, sitting by assignment.)


APPEARANCES:

CLARKE W. OWENS, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and NATHAN R. SHAKER, Assistant Prosecuting Attorney, for Appellee.

JENNIFER ROBERTS, Attorney at Law, for Appellee.

RENEE JACKWOOD, Guardian ad Litem.