[Cite as *In re S.P.*, 2014-Ohio-3802.]

STATE OF OHIO        )               IN THE COURT OF APPEALS
                            )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT   )

IN RE: S.P.                              C.A. No.     27299
      T.R.
      T.H.

                                    APPEAL FROM JUDGMENT
                                    ENTERED IN THE
                                    COURT OF COMMON PLEAS
                                    COUNTY OF SUMMIT, OHIO
                                    CASE Nos.    DN 11 11 0733
                                                    DN 11 11 0734
                                                        DN 11 11 0735

DECISION AND JOURNAL ENTRY

Dated: September 3, 2014

BELFANCE, Presiding Judge.

**{¶1}** Appellant, Nikki R. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor children, S.P., T.R., and T.H., and placed them in the permanent custody of Summit County Children Services ("CSB"). For the reasons that follow, this Court affirms.

I.

**{¶2}** Mother is the biological parent of three children: S.P., born March 19, 2003; T.R., born March 11, 2005; and T.H., born June 5, 2008. Each child has a different father and no father has appealed from the judgment of the trial court.

**{¶3}** When this case began, the children, ages 8, 6, and 3, were residing with Mother and her boyfriend, Dean. CSB became involved because the children were coming to school dirty, hungry, and tired and had reported to school personnel abusive and neglectful behavior by

Mother. On December 12, 2011, the agency filed a complaint in juvenile court, alleging that the children were abused, neglected, and dependent and requesting that the court place them in the temporary custody of the agency. The agency dismissed the allegation of abuse and Mother stipulated to an adjudication of neglect and dependency. In addition, Mother agreed to the placement of the children in the temporary custody of the agency.

{¶4} Mother's case plan, as adopted by the trial court, focused on her difficulty in managing anger, particularly in regard to discipline. The case plan required Mother to engage in individual counseling that specifically addressed anger management and to practice the techniques she learned in her interactions with her children. It also required Mother to complete parenting classes in order to learn normal child behaviors and to apply non-harmful age-appropriate discipline techniques. Subsequent amendments added requirements to address chemical dependency and to obtain housing and employment.

{¶5} The children's case plans required the two oldest children to obtain mental health evaluations and to follow any recommendations for counseling. They were diagnosed with posttraumatic stress disorder. Later, these children revealed that all three of them had been exposed to sexual abuse and that was added to their therapy as well. The caseworker described the level of trauma experienced by these children as "probably one of the higher cases that I've dealt with."

{¶6} All three fathers had case plans, but none put much effort into addressing the objectives. At the time of the permanent custody hearing, the fathers of S.P. and T.H. were incarcerated and the location of T.R's father was unknown. T.H.'s father was represented by counsel at the permanent custody hearing, primarily to support the placement of the children

with T.H.'s paternal grandmother ("Grandmother") and her second husband (collectively "Grandparents").

{¶7} On June 20, 2013, CSB moved for permanent custody. Following a hearing, the trial court granted CSB's motion. Mother appeals and assigns one error for review.

II.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN ITS DECISION WHICH TERMINATED MOTHER'S PARENTAL RIGHTS AND PLACED THE CHILDREN IN THE PERMANENT CUSTODY OF SUMMIT COUNTY [CHILDREN'S] SERVICES AS IT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶8} Mother contends that the judgment of the trial court, granting permanent custody of the children to CSB, is against the weight of the evidence. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶9} The trial court found that the first prong of the permanent custody test was satisfied because the children had been in the temporary custody of CSB for at least 12 of the prior 22 months. Mother does not contest that finding, but rather challenges the finding that permanent custody is in the best interest of the children.

{¶10} When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the children, the wishes of the children, the custodial history of the children, and the children's need for permanence in their lives. *See In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3, (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

**1. The interaction and interrelationships of the children.**

{¶11} The children's strongest bond was with each other. At every opportunity, when asked where they wanted to live, the children's greatest concern was that they remain together. The guardian ad litem described their relationship as "very, very close[,]" and the caseworker said they are "inseparable." The children's therapist similarly testified that they are very close and that S.P., in particular, loves his younger siblings very much and cannot imagine being apart from them. She recommended that they should remain together.

{¶12} The relationships and interaction between the children and Mother are important to the resolution of this case. The caseworker and guardian ad litem both agreed that there is a bond between Mother and her children and that they love each other, but there was also evidence of significant and concerning difficulties in their relationship. While they were living with Mother, the youngest child was largely protected by his age and by his siblings, whereas the two older children were angry, fearful, and often in trouble at school. S.P. had anguishing traumatic

tantrums, including screaming and crying. Despite testing as a gifted child, S.P. was not doing well academically in school, and he was suspended five times within the school year.

{¶13} S.P. and T.R. reported that Mother hit them with belts, spoons, spatulas, and "tools." The therapist said T.R. was terrorized by the spankings. In addition, S.P. told the therapist and the caseworker that Mother had held his head over an open flame of the gas stove for allegedly taking CDs belonging to Mother's boyfriend. T.R. reported that S.P. killed a cat by throwing it up against a wall and stole a bicycle because Mother told him to. Further, the two older children told the caseworker that they witnessed Mother having sex with numerous men and once with a boyfriend and her sister together. They had to remove T.H. from Mother's bedroom door because he was watching Mother having sex with someone. Mother reported being abused by a boyfriend and that the children observed it.

{¶14} There was evidence before the trial court that both T.R. and T.H. had developed sexualized behaviors. Mother further encouraged this by giving seven-year-old T.R. big earrings and a sweater to wear off her shoulders, which T.R. sneaked into school. T.R. was flirtatious in her behavior and got into trouble at school for causing disruptions. She would sit on men's laps and give them hugs and kisses. She was overly clingy with boys and sought their attention. Three-year-old T.H. also exhibited sexualized behaviors, such as pulling down T.R.'s pants and staring at her, getting under the blankets with her, and trying to kiss and "hump her."

{¶15} In addition, there was evidence about the children being deprived of food. S.P. reported that there were times that he did not get to eat dinner because he had sneaked chips in the afternoon. The children told the therapist that Mother would sometimes sleep all day and they grew hungry, so S.P. would make food for his younger siblings. He got in trouble with Mother for that, and she locked him in the basement without food for long periods of time, long

enough for him to feel hungry and be "absolutely scared, terrified." S.P. described the basement as cold and dark. S.P. reported that Mother locked him outside of the house on another occasion and refused to let him in. T.R. reported that she was put in the attic for long periods of time in all kinds of weather without food. Neither the basement nor the attic had toilet facilities. In light of these statements about the withholding of food, we note that the children's trauma therapist testified that the two oldest children initially presented with concerns of lying, sneaking, and hoarding food. She explained that hoarding was a common response in children who have been neglected or do not have enough food at times.

{¶16} An additional concern was raised at a sunset review hearing held on April 25, 2013. At that time, CSB's attorney sought a no-contact order between Mother and the children based on a recommendation from the children's trauma therapist. The children recently told the therapist that they had been sexually abused by the maternal grandmother's former paramour, who was allowed to babysit the children two or three years earlier, and the therapist recommended a cessation of contact to allow further disclosures. It was reported that Mother knew about the allegations and told the children to keep this "our little secret."[1] The counselors were concerned that the children would stop disclosing due to a fear of Mother. Seeing and talking to Mother set off "triggers" in the children that pushed back their therapeutic progress. At the same hearing, a CSB social worker reported that Mother clearly exhibited favoritism

---

[1] The two older children reported that the babysitter said he was checking to see if they wet their pants and that he put his hands down their pants and fondled them. They both told their therapist that when they reported this to Mother, she said, "Let's just keep this to be our little secret."

In response, Mother claimed that she contacted the police and that the maternal grandmother stopped seeing the man. Mother admitted that she told the children not to talk to anyone about it.

towards T.R. and ignored S.P. at visitations, including a recent birthday celebration, causing S.P. a great deal of anxiety.

{¶17} The magistrate granted a temporary suspension of visitation pending a hearing set for May 9, 2013. Following that hearing, the magistrate explained:

> [T]he court finds that although even a temporary severance of visitation between the mother and the children is a significant action to be taken by the court, that the needs of these children out weigh [sic] the mother's and children's right to visitation at this time. The court finds that all 3 children are involved in trauma counseling * * *. The therapist for [S.P.] and [T.R.] is recommending that no contact continue because of its interference with the trauma therapy. It is believed that the mother's contact with the children, who have recently disclosed issues of physical abuse, neglect and sexual abuse while in the care of the mother, would significantly impair the willingness of these children to continue to disclose.

The magistrate continued the no-contact order until the next scheduled hearing or "until such time as the counselor for the children believes re-contact with the mother will no longer jeopardize the children's therapy."

{¶18} Mother did not object to the magistrate's decision to temporarily suspend visitation, nor did she file a motion to set aside the magistrate's subsequent order to continue the suspension after a full hearing on the matter. Moreover, she never filed a motion to reinstate visitation.

{¶19} There was also evidence before the trial court regarding the current status of the children and the changes that had taken place since their removal from Mother's home. The therapist explained that, although the mental health of the children was injured by their past experiences, it was being repaired in a very positive way. She credited the safe, stable home environment in which they then resided for allowing them to thrive.

{¶20} The guardian ad litem testified that all the children were doing very well. The caseworker agreed that the children have all undergone "major" changes. S.P., in particular, was

doing much better. Notably, he no longer sneaked food or hoarded it. S.P. said that he felt safe, supported, and comfortable with Grandparents. He no longer feared physical outbursts or physical punishment, but accepted reasonable discipline calmly. His anger had decreased considerably, and he no longer had traumatic tantrums. He had begun living his life as a child and no longer saw himself as a caregiver. He was coming to realize that he did not deserve the treatment he had received. He was making friends and was involved at school, at church, and in the community. He was getting very good grades in school and had not been suspended during the current school year.

{¶21} The two younger children were losing their sexual behaviors and their behavior was age-appropriate. T.R. was becoming a little girl again and was doing better in school. She was wearing more child-appropriate clothing, watching television shows more appropriate to her age, and learning to observe proper boundaries with others. She was described as a happy child who was thriving with Grandparents.

{¶22} Turning to the children's relationship with Grandparents, at the time of the permanent custody hearing, the children were said to be well-bonded to Grandparents. Prior to the events of this case, the children periodically stayed with Grandparents for vacations while they were still living with Mother. The record reflects that when they were residing with Grandparents, the children were doing well in school, were happy, and felt safe. The guardian ad litem was impressed by the way Grandmother handled discipline; she was not angry or forceful, but talked to the children. She said that S.P. responded very well to that. The therapist observed the children interacting with Grandparents and believed their relationship was good. She had found that Grandparents were invested in the children's therapy. The children have had no attendance problems in school while residing with them and were making appropriate progress.

The therapist said that young T.H. had completed his trauma therapy, and she projected that, if the two older children stay with Grandparents, they will finish their therapy in two or three months. She anticipated needing to revisit that estimate if the children are returned to Mother.

**2. The wishes of the children.**

{¶23} The wishes of the children were conveyed by the guardian ad litem. She explained that the children initially hoped to return to Mother, but only if things changed. Early on, S.P. repeatedly said he wanted to go to counseling to learn how he could be different so Mother would not do those things to him. S.P. was later sad to learn that Mother was not actively working to regain custody of him and his siblings.

{¶24} The guardian ad litem testified that based on her most recent conversations with the children, however, they very much wanted to stay with their current caregivers and not return home. She explained that they were "thriving" in that home and that the transformation of the children over the past year has been "miraculous." She believed it "would be devastating for the children to go back to live with their mother" and "[d]efinitely" believed that it would be in their best interests to be placed in the permanent custody of CSB. The caseworker and therapist testified to similar effect, including a report by the therapist that the children said they would not feel safe returning to Mother because they were afraid the treatment they had received in the past would continue.

{¶25} On appeal, Mother argues that the trial court did not consider the effect of the suspension of Mother's visits on their custodial wishes and on the recommendation of the guardian ad litem. In this regard, Mother suggests that it is possible that the lack of contact with the children due to the order of the court may have had a profound impact on the expression of their wishes to the guardian ad litem. While Mother's argument is speculative, as noted above,

Mother has not challenged the propriety of the temporary orders suspending her visitation with the children. It is apparent from the record that the trial court was presented with evidence which it found merited the suspension of visitation with Mother for a significant period of time. Moreover, the record includes specific testimony from the guardian ad litem and the caseworker regarding the positive impact of the suspension of visitation upon the children.

{¶26} The guardian ad litem testified that she had asked the children if they wanted to renew visitation with Mother and they responded that they did not. She explained that the suspension of visits had allowed the children to feel freer in what they did and said, whereas having visits with Mother caused their behavior to seriously regress. While the guardian ad litem felt badly for Mother because she loves the children, the guardian ad litem felt that Mother was not able to adhere to appropriate boundaries and do what was best for the children. The guardian ad litem testified that she repeatedly told Mother what to do to attempt to get her visits reinstated, but Mother failed to follow-up on those recommendations.

{¶27} Likewise, the caseworker testified that the lack of visits was concerning at first because the children love Mother and are bonded to her. The lack of visits no longer concerned her, however, after she started to see all the positive changes in the children. She pointed out that S.P. and T.R. have come from being parentified to behaving as children. In addition, all three children are able to be happy, play, and do things together and with Grandparents. Thus, in light of these positive changes, the caseworker stated that her focus was to provide the help the children needed to heal and move on.

{¶28} Moreover, as discussed above, two hearings were conducted on CSB's motion to suspend Mother's visitation with the children. Testimony was heard, and the trial court found that a suspension of visitation was necessary to protect the children and was done in their best

interests. Following those hearings, Mother failed to file an objection to the magistrate's decision to temporarily suspend visitation or to move to set aside the magistrate's order to continue the suspension. Nor did Mother ever move to reinstate visitation. In addition, the children's therapist, the guardian ad litem, and the caseworker extensively addressed the matter at the permanent custody hearing. Accordingly, we conclude that Mother's argument is without merit.

**3. The custodial history of the children.**

{¶29} The record reflects that the children resided with Mother until they were removed from the home by CSB in this case. They remained in the custody of CSB from December 2011, until the permanent custody hearing conducted in January and February of 2014. During this period, the children were in the care of two foster families before being placed with Grandparents in December 2012, where they have remained for the last year.

**4. The children's need for a legally secure permanent placement and whether that can be achieved without a grant of permanent custody.**

{¶30} Mother argues that the trial court's finding with respect to this best interest factor is erroneous and merits reversal of its judgment. However, upon careful review of the record, there is no evidence that, at the time of the permanent custody hearing, Mother had successfully addressed the serious deficiencies in her parenting. According to the caseworker, when she attempted to discuss her concerns about Mother's parenting, Mother would explain that it was "how she was raised" and a "family cycle" that "she had to go through." Mother said she "doesn't know any other way" and "doesn't know how to change it."

{¶31} The caseworker testified that Mother had not made any significant progress on her case plan objectives and that she believed permanent custody was in the best interest of the children. The record demonstrates that Mother attended 12 sessions of individual counseling

before she was discharged for non-attendance. Her counselor stated that she made little progress because of the sporadic nature of her attendance. Mother did complete group programs in anger management and parenting. However, the caseworker, who observed 40 visits between Mother and the children, said she observed no improvement in Mother's parenting and the children did not respond to her efforts at discipline. Furthermore, Mother lacked insight into the children's needs and did not seem to understand when the caseworker tried to explain basic parenting concepts to her, such as the importance of keeping promises to her children and treating the children equally. The caseworker did not believe Mother made any progress on her substance abuse objective. This is reflected in the fact that Mother was discharged from two substance abuse programs, quit a third after just one month, and periodically tested positive for marijuana throughout the proceedings, although she repeatedly disputed the test results. Mother obtained a job within the last month and presently lives in a physically appropriate home, but does not have a lease or written agreement.

{¶32} Mother's continuing parenting difficulties that were of concern below are demonstrated in the record. For example, the caseworker noted Mother's favoritism towards the two younger children and against S.P. during visits. This issue came to a head after the March 2013 visit, which took place between the March 11 birthday of T.R. and the March 19 birthday of S.P. According to both the caseworker and the therapist, Mother brought gifts for T.R. and celebrated her birthday, but did nothing for S.P. The caseworker said that S.P. was very hurt and angry afterwards, and he cried for hours during the car ride home. According to the trauma therapist, Mother told S.P. not to worry because his birthday was not for "a day or two" and she would mail him his gift. By the time of the permanent custody hearing, ten months later, S.P. still had received no birthday gift from Mother.

{¶33} The caseworker attempted to explain to Mother how S.P. felt, but Mother never seemed concerned about failing to bring or send a gift to S.P. This greatly concerned S.P.'s therapist because S.P. felt that Mother did not love him, care for him, or want him as compared to his sister. For her part, Mother testified that she did bring gifts for S.P. and said that she always gave the children separate time to feel like they had her full attention.

{¶34} In addition, the caseworker had many discussions with Mother about discipline, and Mother generally denied or attempted to diminish the allegations against her. For example, the caseworker and S.P.'s therapist both testified that S.P. said Mother held his head over the open flame of a gas stove. When the caseworker asked Mother about this, as the caseworker later testified, Mother did not deny it, nor did she claim that S.P. was making the story up, but rather said "I don't remember that ever happening." After hearing this testimony by the caseworker, Mother took the stand and denied holding S.P. over the stove flame. At best, there is conflicting testimony on the subject, most properly for consideration by the trier of fact. *See In re J.G.,* 9th Dist. Wayne No. 14CA0004, 2014-Ohio-2570, ¶ 12.

{¶35} Likewise, Mother denied locking the children in the basement, attic, or outside the house. However, in a telephone conversation with the guardian ad litem, Mother reportedly said the basement was "finished" so if she put S.P. down there, it was "no big deal." Within a day or two of that conversation, the guardian ad litem visited the home and was able to see the basement, which she described as "1920s -- like a cave. It wasn't even almost finished. It would be scary to me as an adult to be down there overnight, let alone a child. I can't imagine." The guardian ad litem continued: "I was just really shocked that she stood there with me, knowing that it wasn't finished and she didn't seem embarrassed or anything that she had lied to me. * * * I didn't know what to believe from her."

{¶36} Finally, Mother testified that when she sent the children to bed without dinner, she would nevertheless give them a sandwich in their rooms so that they had something to eat. The trier of fact was entitled to consider this evidence along with the testimony of the trauma therapist that the two older children presented with behaviors of hoarding food, which is a common behavior in children who have been neglected or do not have enough food at times.

{¶37} The caseworker testified that the children are doing well in their placement with Grandparents, and that Grandparents are interested in adopting all three children if permanent custody is granted. The caseworker discussed the option of legal custody with Grandparents, but they preferred to pursue adoption. There are no other suitable relatives available to assume care of the children.

{¶38} On appeal, in addition to Mother's general assertion that the trial court judgment granting permanent custody of the children to CSB is against the weight of the evidence, Mother specifically claims that three statements within the trial court's judgment entry are erroneous or not supported by the weight of the evidence. First, she disputes any reliance by the trial court on the fact that she had positive drug test results for marijuana because her drug use did not have a detrimental effect on the children. However, there was evidence before the trial court that Mother used marijuana in the presence of the children and that they remember it. In addition, there was evidence that Mother used marijuana on a fairly regular basis and also while she was pregnant with her fourth child. The guardian ad litem expressed concern with Mother's unwillingness to be honest about her drug use.

{¶39} Second, Mother challenges the trial court's finding that she cannot provide for her children's needs as being against the weight of the evidence. In support of her position, Mother points to the fact that she is currently employed and has housing. Mother testified that she has

been working 20-25 hours per week as a state-tested nursing assistant.  She did not testify to her income and has held her job less than a month.  Mother had housing at the beginning of the case but was evicted within three months.  For the remainder of the case, she stayed with family or friends.  The caseworker was only able to visit Mother once at a home where she was living because Mother said her residences were inappropriate.  The caseworker's only residential visit was in December 2013, at a home owned by the parents of her boyfriend, Mike.  The housing was said to be physically adequate, but Mother had no lease.  Mother has a three-month-old infant, and the couple very recently learned that Mike is not the father of the child.  Mother nevertheless expects to continue to reside in this home, has no alternative plan, and stated that she believes her boyfriend's parents intend to put the house in her name.  The caseworker and the guardian ad litem both expressed concern about the long-term prospects of this arrangement and advised Mother to obtain a lease agreement.

{¶40}  Finally, Mother claims that the trial court's finding that she "severely abused the children when she had custody of them" is not supported by the weight of the evidence.  Based on her lawyer's representations at oral argument, the dispute is apparently with the trial court's classification of the degree of abuse of the children as severe.

{¶41}  Upon consideration, we find these three arguments to be unpersuasive on the ultimate question before us.  Moreover, we have carefully reviewed the entire record and do not conclude that the trial court's judgment terminating the parents' parental rights is against the weight of the evidence.  *See Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  Mother's sole assignment of error is overruled.

III.

**{¶42}** Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

MOORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

HOLLY KEHRES FARAH, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.

THOMAS LOEPP, Attorney at Law, for Father.